UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL TORRES,

        Plaintiff,

   - against –

NEW YORK STATE DEPARTMENT OF       **COMPLAINT**
CORRECTIONS AND COMMUNITY
SUPERVISION, TIMOTHY MANNOCCHI,     9:20-cv-301 (GLS/TWD)
TREVOR PATON, CHERYL MORRIS and
JASON GIBSON

        Defendants.

## PRELIMINARY STATEMENT

    This is a civil rights action filed by Michael Torres ("Mr. Torres" or "Plaintiff"), a prisoner in the custody of the New York State Department of Correction and Community Supervision ("DOCCS'), for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 – 12132, Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794(a) and his free speech rights secured by the First Amendment to the United States Constitution brought pursuant to 42 U.S.C. § 1983. In short, Mr. Torres requires reasonable accommodations for his severe learning disabilities to allow him access to the benefits and services offered by DOCCS to non-disabled inmates, including education and vocational training.

## JURISDICTION AND VENUE

1.   The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.

2.   The Northern District of New York is an appropriate venue under 28 U.S.C. § 1391(b)(2) as the situs of the events giving rise to the claims herein.

## JURY DEMAND

3.      Plaintiff demands trial by jury in this action.

## THE PARTIES

**Plaintiff**

4.      Mr. Torres was at all times mentioned herein a prisoner in the custody of DOCCS. He is currently confined at the Eastern Correctional Facility ("Eastern") in Napanoch, New York.

5.      Mr. Torres has endured a lifelong struggle with learning disabilities. He has been diagnosed with dyslexia and dyscalculia.

6.      Mr. Torres' disabilities affect major life activities such as learning, reading, concentrating, communicating, interacting with others, speaking, thinking and working.

7.      Mr. Torres, with or without reasonable accommodations, meets the eligibility requirements to access programs, activities, services and benefits available to all inmates in DOCCS' custody.

8.      Mr. Torres is a "qualified individual with disabilities" as that term is defined in the ADA and Rehabilitation Act.

**Defendants and State Actors**

9.      **DOCCS** is the New York State agency responsible for the care and custody of New York State prisoners. DOCCS receives federal and state funding to support their programs and services.

10.      **Timothy Mannocchi** ("Defendant Mannochi") is a Vocational Instructor at Eastern. Defendant Mannocchi was Mr. Torres' instructor in the Building Maintenance Program. He is an employee of Defendant DOCCS. He was directly responsible for instructing and evaluating Mr. Torres.

11. **Trevor Paton** ("Defendant Paton") is the Educational and Vocational Supervisor at Eastern. He is an employee of Defendant DOCCS. He is responsible for arranging accommodations for Mr. Torres – allowing him to participate in DOCCS' programs to further his education and vocational training.

12. **Cheryl Morris** ("Defendant Morris") is the Deputy Superintendent of Programs at Eastern and an employee of Defendant DOCCS. She is responsible for prison programs, providing disability accommodations to eligible inmates and ensuring the facility's compliance with the ADA. Defendant Morris is also responsible for development the computer and equipment use policies in the Law Library and SDU Resource Room at Eastern.

13. **Jason Gibson** ("Defendant Gibson") is the Translator for Manual Communications for inmates with sensorial disabilities at Eastern. He is an employee of Defendant DOCCS. He is responsible for providing or coordinating sign language interpreting services for inmates who are deaf or hard of hearing and communicate primarily with sign language. Mr. Gibson also seems to have oversight of the Sensorial Disability Unit ("SDU") Resource Room.

14. **Jane or John Doe** ("Jane or John Doe") is an Eastern administrator responsible for crafting and enforcing the policies regarding use of the Law Library computers and equipment and/or the SDU Resource Room computers and equipment.

## PREVIOUS LAWSUITS IN STATE/OR FEDERAL COURT

15. Plaintiff filed a *pro se* Complaint, entitled *Torres v. New York State Department of Corrections and Community Supervision*, *et al.*, 1:19-cv-02883-CM, on March 29, 2019. Mr. Torres received help from a fellow inmate drafting the complaint but was unable to fully execute his filing obligations when DOCCS transferred the inmate helping him to another facility. The complaint was dismissed without prejudice.

3

## ALLEGATIONS

16.     Mr. Torres has been exclusively in the custody of DOCCS since 1995.


### Mr. Torres' Disabilities

17.     Mr. Torres suffers from two primary learning disabilities: dyslexia and dyscalculia.

18.     Dyslexia is a general term for disorders affecting the brain that cause difficulty with learning, reading, interpreting words, letters and other symbols.

19.     Dyscalculia is a brain disorder that negatively impacts one's ability to understand, interpret or complete arithmetical calculations.

20.     I.Q. tests have also established that Mr. Torres suffers from intellectual disability in the mild range which negatively impacts his comprehension and adaptive behaviors, including his ability to communicate with others.

21.     Mr. Torres' disabilities make it extremely difficult for him to read, write and complete simple calculations.

22.     Mr. Torres has struggled with dyslexia and dyscalculia his whole life.  He was first diagnosed with dyslexia in the 1980s, at which time he was placed in Special Education classes in school.  He was held back in the Second Grade and failed to progress in school.

23.     DOCCS has consistently recognized Mr. Torres' disabilities by verifying that he has "mathematics disorder (315.1)" and "reading disorder (315.0)" on medical verification and other diagnostic forms.  These forms are included in Mr. Torres' medical and counseling records maintained by DOCCS.

24.     On January 3, 1995, Mr. Torres was sent to Downstate Correctional Facility ("Downstate"), one of DOCCS' intake facilities, where he was to be evaluated for reasonable

accommodations.  However, Mr. Torres did not receive an initial evaluation for accommodations at Downstate.

25.     In all of its facilities, DOCCS offers an Adult Basic Education Program, provided to meet the needs of incarcerated individuals who have reading and math scores below the sixth-grade level.  DOCCS describes the goal of this program to, "provide individuals with skills or competencies necessary to function successfully in contemporary society and to enable the participant to function at the sixth-grade reading and mathematics level."

26.     For years, DOCCS placed Mr. Torres in basic education classes, however, he has never earned a GED and has consistently struggled to progress.

27.     In 2009, the teacher at Green Haven Correctional Facility ("Green Haven"), had him removed from basic education classes writing, "Mr. Torres has been in the academic program at GHCF for many years.  After much effort by myself, teacher, in both individual and group lessons he continues to be inconsistent in his grades fluctuating up and down 1-2 grade levels, therefore, he is not progressing and removal is recommended at this time."

28.     In response, Mr. Torres fought very hard to remain in the educational program and gain the accommodations and assistance he required to learn.  Mr. Torres' failure to progress was despite glowing reviews from teachers saying that he worked very hard and was a pleasure to have in class.

29.     On August 4, 2011, while still housed at Green Haven, Mr. Torres filed a lawsuit entitled, *Torres v. New York State Department of Corrections and Community Supervision, et al*., 11 Civ. 05762 (RMB)("*Torres I*"), against DOCCS and responsible personnel, for their failure to accommodate his learning disabilities and allow him access to educational/vocational programs and benefits.

30.     As a byproduct of that lawsuit, on February 6, 2012, Mr. Torres finally received a psychological evaluation to clinically assess his disabilities.  He was again diagnosed with dyslexia and dyscalculia, as well as with non-significant hearing loss (HL-30).

31.     Although the hearing loss diagnosis does not qualify Mr. Torres as an inmate with a sensorial disability pursuant to DOCCS Directive #2612, Mr. Torres still needs assistance, devices and services to accommodate his learning disabilities.

32.     A Settlement Agreement was reached and signed by DOCCS and Mr. Torres to resolve *Torres I* on February 13, 2013.

33.     Pursuant to the Settlement Agreement, DOCCS agreed to provide Mr. Torres reasonable classroom and standardized testing accommodations, including but not limited to, extended time, supervised breaks, audiocassette recordings of material with extended time, a scribe, or the use of a calculator or talking calculator when permissible on the mathematics portion of the standardized tests.

34.     DOCCS also agreed to provide Mr. Torres with classroom accommodations as required or recommended by his most recent evaluation on file.

35.     The Settlement Agreement provided for a second psychological evaluation designed to clinically evaluate Mr. Torres' learning disabilities within five years of February 6, 2012.

36.     Mr. Torres was given this second psychological evaluation in May of 2014 by DOCCS' psychologist, William Aitcheson, to determine the effectiveness of previous recommendations and to definitively determine his need for testing accommodations. This was the last psychological evaluation he has received – over six years ago.

37.    The 2014 evaluation results indicated no change in academic competence since the 2012 evaluation. Mr. Aitcheson concluded, "such stagnation indicates that previous recommendations were inadequate to the task of improving overall academic competence."

38.    As a result of the evaluation, the recommendations from the 2012 psychological report were amended in the 2014 psychological report to include 200% extended time on all tests, separate location for testing, and a rest break every thirty minutes.

39.    Mr. Aitcheson further recommended that specific pre-reading and note taking instruction and practice be instituted, reading and math instruction continue, a speech and language "second option" be sought that evaluates Mr. Torres' language competence, counseling support and guidance for encouragement and motivation be provided on a consistent and mutually agreed upon basis, and that a digital reader be supplied to improve effective access to written materials in and out of the classroom.

40.    Eastern provides some of these accommodations to Mr. Torres in his Basic Education class, however, none of them are provided outside of that environment. In particular, Mr. Torres requires accommodating devices to read and write outside of the Basic Education classroom. The only accommodation he is afforded outside the Basic Education classroom is a talking dictionary which he keeps in his cell. The talking dictionary does not enable him to read and write, but it does give him the meaning of words if he types them into the device.

41.    Because of his learning disability, Mr. Torres cannot type or read text and simultaneously comprehend the content. Mr. Torres needs to listen to what he is typing while viewing it on a screen in order to compose and edit documents.

42.     Two accommodating devices allow Mr. Torres to read and write without assistance from a non-disabled individual: A SARA (Scanning and Reading Appliance) and a computer with audio-enabling programs.  These are akin to the "digital reader" suggested in the 2014 evaluation.

43.     A SARA is a desktop device that allows the user to place a document on the surface and the machine will read the contents of the documents aloud and/or blow up the text to a much larger size for easier reading.  A SARA reader is not a device for typing -- just the reading of documents.

44.     A computer with audio-enabling programs is a particularly necessary accommodation for Mr. Torres.  A computer equipped with audio software reads text to the user, but, more importantly, reads text as the user writes text.  The features allow Mr. Torres to read and write independently.  Without this accommodating device, Mr. Torres is dependent on other inmates to voluntarily help him – this help is often elusive and makes him dependent on others.

### Accommodating Devices at Eastern

45.     Some DOCCS' prisons include 'resource rooms' for sensorially disabled inmates.

46.     Though "sensorial disability" refers to disabilities that commonly effect hearing and seeing, the Sensorially Disabled Units ("SDU") possess the auxiliary aids and services that Mr. Torres needs to address his disabilities.  There is only a trio of maximum-security prisons that have SDUs: Eastern, Sullivan Correctional Facility ("Sullivan"), and Wende Correctional Facility ("Wende").

47.     On April 7, 2015, Mr. Torres submitted a Request for Reasonable Accommodation in the form of a transfer from Green Haven to Sullivan where he could have access to the SDU Resource Room and educational and vocational programs, devices and other support to accommodate his disabilities.

48.    Mr. Torres was not transferred to Sullivan, but rather to Coxsackie Correctional Facility ("Coxsackie") on April 21, 2015. During his time at Coxsackie, Mr. Torres was given some accommodations, such as extended time, separate location and breaks for tests.  Toward the end of his housing period at Coxsackie, a SARA reader was brought in for Mr. Torres, but he only used it a handful of times before he was transferred out of the facility.

49.    Mr. Torres was transferred to Eastern in or about August 2016.

50.    Upon arrival at Eastern, Mr. Torres was approved for the following accommodating auxiliary aids and services: audiocassette player, talking calculator, talking dictionary, SARA scanner, and audio computer.

51.    However, Mr. Torres has not been afforded access to these accommodating devices in a manner that allows him to participate in services, programs and benefits as afforded non-disabled inmates.

**Eastern's SDU Resource Room**

52.    The SDU Resource Room at Eastern has SARA readers and computers with audio software to assist disabled users with the reading and creation of documents.

53.    The SDU Resource Room is scheduled to be open from 8:00am to 4:00pm on weekdays.  Whether or not there are inmates using the room, an officer is positioned it the room as it is also the entry point for the Education Room.

54.    To use the SDU Resource Room, inmates must request a "call out" meaning they are 'called out' of whatever programming they are attending and escorted to the SDU Resource Room.

55.     Programming at Eastern is divided into am and pm sessions.  Most prisoners at Eastern, including Mr. Torres, are assigned to both an am 'program' and a pm 'program' and thus, unavailable for call out when the SDU Resource Room is "open."

56.     The SDU Resource Room used to be deemed a "program," meaning that inmates in need of its accommodating devices would be assigned to the room during the am or pm module, so they could write and read.  Eastern has stopped allowing the SDU Resource Room to be an assigned 'program,' severely curtailing its accessibility to inmates in need.

57.     As a recent grievance response reported, "inmates must write [for call out]" and they "can participate during the am/pm if not assigned to a program." (emphasis added.)

58.     This policy means that most eligible inmates cannot use the SDU Resource Room when it is open.

59.     The Call Out process is regulated by Ms. Lewis.

60.     On July 3, 2018, Mr. Torres wrote a letter to Ms. Lewis, asking her to put him on "a call out" to use the computers in the SDU Resource Room. Ms. Lewis responded to his request on July 5, 2018 stating, "As per the D[eputy] S[uperintendent] of P[rograms] you can access the SARA machine, but not the computers." The DSP is Defendant Morris.

61.     On September 19, 2018, the Inmate Liaison Committee met. This Committee is comprised of inmate representatives and members of the administration, including Defendant Morris. One of the discussion items on the agenda was the inability of SDU inmates to access the SDU Resource Room.

62.     The administration's response to the lack of access to the SDU Resource Room was that the SARA machine in the Law Library "transcribes spoken language into audio form." Eastern

administration suggested that inmates requiring use of the accommodating devices in the SDU Resource Room had a sufficient alternative in the one SARA device in the law library.

63.     Even if the one SARA machine in the law library was not in heavy demand, the SARA machine has no audio software or capabilities to facilitate Mr. Torres' typing.

64.     On November 15, 2018, Mr. Torres received a memorandum from Defendants Morris and Gibson informing him that he no longer had access to SDU computers. Without these accommodating devices Mr. Torres is unable to read and write when he is not attending Basic Education programming without assistance from a volunteer.

65.     Mr. Torres wrote to Ms. Lewis requesting a book on audio and she responded on November 15, 2018, letting him know that the book was available and reminding him that as per the DSP, "you no longer have access to the SDU computers" although he did "have access to the SARA machine."

66.     The Legal Aid Society of New York ("Legal Aid"), on behalf of Mr. Torres, wrote a letter to DOCCS on December 10, 2018 regarding Mr. Torres' lack of access to the computers in the SDU Resource Room.

67.     Defendant Morris responded to Legal Aid's letter on January 4, 2019 and argued that the Law Library computer had the same programs/software as the SDU Resource Room computers.

68.     This assertion was categorically untrue.  The computers in the law library do not have the audio "read as you type" capability that Mr. Torres needs and the law library only has one SARA machine for the use of all inmates for audio translation of text.

69.     On August 14, 2019, the SARA device in the Education Room was not working and Mr. Torres had no alternative but to try to use the SDU Resource Room.

70.    When he arrived in the SDU Resource Room, Defendant Gibson, the translator for inmates with sensorial disabilities at Eastern, asked Mr. Torres who gave him the authorization to use the device. Defendant Gibson suggested that only visually impaired inmates could access the Resource Room as the room's resources were not part of the Educational Program.  Gibson denied access to Mr. Torres.

71.    Mr. Torres filed a grievance regarding this incident on August 19, 2019. He explained in this grievance how his disabilities effect his "mental faculties, and how [he] ultimately perceive[s] a given task," which is why he needed the equipment in the SDU Resource Room. He also noted how Defendant Gibson made inappropriate comments such as "it's not like any of [the inmates] are going to get their GEDs anyways" to Corrections Officer Cole during the incident.

72.    On December 7, 2019, Mr. Torres filed a grievance requesting access to the computers in the SDU Resource Room, explaining why he needs the audio capabilities and emphasizing that he has requested access on multiple occasions.

73.    This grievance states that although Mr. Torres has filed multiple grievances in the matter in the past, "DOCCS prison officials continue to deny him access to the SDU resource room computers" and fail to provide him "the proper equipment to do his legal work in the law library." At the bottom of this grievance, Mr. Torres noted that somebody helped him draft the document.

74.    The Assistant Director of the Inmate Grievance Program responded to Mr. Torres on December 11, 2019. She stated that Mr. Torres had six (6) pending grievances at Central Office and that they would send him a Receipt of Appeal once the grievances were scheduled to be heard by COR – meaning there was no relief in sight.

75.    On December 16, 2019, Mr. Torres filed another grievance regarding his lack of access to the computers in the SDU Resource Room.

76.     On December 29, 2019, Mr. Torres wrote a letter to Superintendent Lee, stating that he had not yet heard from the Inmate Grievance program in regard to the grievances that he filed.

77.     On January 9, 2020, DOCCS responded to Mr. Torres' grievance filed on December 16, 2019 stating that the reason Mr. Torres was denied access to the SDU Resource Room was because he did not meet the requirements of a sensorially disabled individual under DOCCS Directive #2612.

78.     In the last year, even though there is a guard monitoring the SDU Resource Room, Eastern has constructively shut it down and inmates have extremely limited access to the computers and other assistive devices in the room.

79.     For a long period of time, the printers have also been removed from the room and computers were unplugged making it impossible for Mr. Torres and other disabled inmates to print out the work that they produce on their accommodating devices.[1]

**Violations of First Amendment**

80.     Mr. Torres seeks access to the SDU Resource Room to be able to read and compose using the audio-enabling software. This is especially important for the drafting of grievances, complaints and papers related to legal activities.

81.     In response to threatened legal action by the sensorially disabled inmates in the custody of DOCCS, the staff at Eastern now demands inmates sign a "Computer Usage Agreement" before they can use equipment in the SDU Resource Room.

---

[1] As a result of the stirrings of a number of the legally blind and visually impaired inmates, it seems a printer was recently placed back in the SDU room and the computers were plugged in, but access is still greatly curtailed.

82.     The Computer Usage Agreement states in relevant part: "any computer assigned to me or used by me will be used for legitimate organizational, academic, or other duties, as assigned, that may pertain to my program assignment. Any misuse of any computer assigned to me or used by me will result in termination of this privilege. In addition, this may result in disciplinary action."

83.     Although this agreement does not facially prohibit inmates from using the computers to do legal work, DOCCS is enforcing the Computer Usage Agreement as a ban on inmates using SDU Resource Room Devices to complete any and all legal work.

84.     For many disabled inmates, like Mr. Torres, whether sensorially or intellectually disabled, the equipment in the SDU Resource Room provides the only accommodations for reading and writing legal work.

85.     Mr. Torres' lack of access to the audio-enabling software to do "legal work" hinders his ability to communicate with counsel, the courts, and even his personal communications. Mr. Torres takes a very long time to communicate with his family or counsel as he must always find a volunteer inmate who is willing and able to help him draft or type any document. If he does not find anyone to help him, he is unable to communicate at all.

86.     Mr. Torres is completely dependent on other willing inmates to draft written communications and DOCCS personnel are aware of this dependency if Mr. Torres does not have appropriate accommodations.

87.     For example, on July 29, 2016, Mr. Torres wrote to Ms. Morris, the DSP at Eastern, regarding issues he was having with his medical care. At the bottom of this letter, he noted that someone helped him write the letter.

88.     Similarly, on May 23, 2018, Mr. Torres filed a grievance requesting the accommodations recommended in the 2014 Psychological Report. At the bottom of the grievance he stated that someone assisted him in writing the grievance due to his "intellectual limitation."

89.     On July 14, 2018, Mr. Torres wrote a handwritten letter to Ms. Morris asking why he was not allowed to use the computers in the SDU Resource Room. Mr. Torres noted at the bottom of this letter that he received help in drafting it.

90.     Notably, when Mr. Torres first attempted to file this action, an inmate agreed to assist Mr. Torres but the individual was transferred out of Eastern leaving Mr. Torres with no way to pursue his claim.

91.     Mr. Torres needed additional help, so he sent the draft complaint to different pro bono services seeking to receive assistance including the SDNY's Pro Se Unit. Unfortunately, the Pro Se Department understandably misunderstood Mr. Torres' appeal for help and filed the incomplete complaint on March 29, 2019.

92.     On April 15, 2019, Mr. Torres found someone to draft a letter to Hon. Colleen McMahon on his behalf regarding the dismissal of his complaint. He stated, "just to write this letter I am dependent on someone else's help."

93.     Mr. Torres would have been able to properly file a completed complaint if he had access to the audio-enabling devices at Eastern located in the SDU Room and/or the law library computers with Westlaw had audio-enabling features.

**The Law Library**

94.     Upon information and belief, Defendant Morris is in charge of developing policies regarding programming including computer and equipment use policies in the Law library.

15

95.     Upon information and belief, Defendant Jane or John Doe may also be in charge of developing and implementing policies regarding computer and equipment use in the Law Library.

96.     Eastern also has computers in the Law Library which "are designed to give inmates basic resources for legal research and preparation of legal paperwork."

97.     However, Defendants Morris and Jane or John Doe implement and enforce a policy under which the Law Library computers cannot be used to draft complaints or correspondence to attorneys on non-criminal legal matters, nor to draft grievances or appeals of disciplinary hearings.

98.     The computers in the Law Library are also the only computers with access to Westlaw, an online legal research service that allows inmates to access case law and statutes.

99.     However, as there are no audio capabilities in the Law Library computers that have Westlaw access, Mr. Torres cannot comprehend what he reads on Westlaw and must rely on another inmate to volunteer to help him.  If he cannot find anyone to help, he cannot conduct legal research.

100.     Defendants Morris and Jane or John Doe implement a Law Library equipment use policy that significantly inhibits inmates, including Mr. Torres, from using law library resources to pursue actions against DOCCS or its employees.

101.     There are signs in the Eastern Law Library that specifically state:

> **The Purpose of Law Library Resources are:**
> **To Fight the Conviction; and**
> **Terms of Confinement**
> **(Appeals and Misbehavior Reports); and**
> **Divorce packets and Custody information**
> **Grievances and correspondence to officials**
> **are not required to be typed.**
> **Law Library type writers are not to**
> **be used for these purposes 106.10.**
> **Misuse of the equipment may result in**
> **disciplinary action or loss of privileges.**

102.    On August 26, 2019, Mr. Torres was using the computers in the Law Library to print a legal document.  However, a corrections officer stopped him and told him that he was not allowed to "print any letters to lawyers, complaints or grievances against DOCCS employees on the Law Library computer."

103.    When Mr. Torres verbally complained, he received a note that read, " – FYI—Law Library Computers may not be used for anything but pending legal issues.  They may not be used for grievance."

104.    Under the Prison Litigation Reform Act, a prisoner must exhaust his/her administrative remedies – in New York through the inmate grievance program – in order to file suit in federal court.

105.    Mr. Torres was eventually able to find an inmate to help him and filed a grievance regarding this incident and requested that he be allowed to use the computers in the Law Library for legal purposes as he does not have the capability to easily handwrite such documents. At the bottom of the grievance, he clarified that someone helped him write the grievance.

106.    Although Mr. Torres can technically draft complaints and grievances by hand, his handwriting is illegible and the language jumbled and often incoherent. He must write his thoughts out and ask somebody else to type them out for him while explaining what he has attempted to write.

107.    The Law Library also has only one SARA machine.

108.    Unfortunately, even though the SARA machine in the Law Library can transcribe written text into audio form, it does not read as one types.

109.    Without the audio capabilities of the computers in the SDU Resource Room, Mr. Torres cannot effectively convey the thoughts that he wishes to express on paper by typing.  And his intellectual deficiencies mean he cannot properly handwrite them.

110.    On September 9, 2019, with the aid of a volunteer, Mr. Torres filed a grievance regarding the lack of an audio typing computer in the law library and his inability to do 'legal work'                on                the                computers                that are there. He explained that his inability to use audio software, "caused me not to be able to send a standard letter to my lawyer and for my other grievances."

111.    Recently, Eastern placed an extra computer in the law library for sensorially disabled inmates to use, however there is no floppy disk drive on the computer and no Westlaw access.  As inmates such as Mr. Torres only have access to floppy discs for saving their work, inmates using the one computer with audio features must request that an officer print it out for him allowing officers to review the limited legal work and correspondence they are allowed to create on law library computers.[2]

112.    Sensorially and intellectually disabled inmates, including Mr. Torres, are not afforded the ability to save their legal work and work on it over numerous days as other non-disabled inmates who can use the regular computers with floppy disk drives.

113.    Eastern has established a scheme where: 1) Mr. Torres cannot do legal work and/or use the accommodating devices in the SDU Resource Room, and 2) Mr. Torres cannot do legal work (unrelated to his criminal conviction) in the law library, cannot do legal research on Westlaw

_____

[2] This development is, again, a product of the SDU inmates' boisterous devotion to legally mandated reasonable accommodations.

and the limited work he can do on the one audio-enabled computer he cannot save to work on over time.

## Access To Vocational Training

114.    Throughout his incarceration, Mr. Torres has strived to learn a trade. He was in the Building Maintenance Program, a vocational program, at Green Haven. When DOCCS transferred Mr. Torres to Coxsackie, he was enrolled into the same program until the shop was closed. He then entered the Electrical Trade program at Coxsackie, however, the program was closed when the instructor left.

115.    When he arrived at Eastern, Mr. Torres once again enrolled in the Building Maintenance Program.

116.    DOCCS describes the Building Maintenance Program as providing, "students with fundamental skills required to make minor repairs in carpentry, masonry, electricity, plumbing and weatherization."  DOCCS describes this program as, "self-paced individualized instruction to assist students in developing competencies in entry level skills . . ." (emphasis added.)

117.    Mr. Torres understands the importance of finding employment to reintegrate himself into society upon his scheduled release in 2024.

118.    The Building Maintenance instructor at Eastern was Defendant Mannocchi and Mr. Paton was in charge of the vocational programming.

119.    Mr. Torres was in the Building Maintenance Program for approximately two years: from summer 2016 to June 2018.

120.    Mr. Torres' progress was appropriate but slow as he struggled to learn how to use the power tools.  Nonetheless, Defendant Mannocchi gave him consistently positive reviews.

121.    On March 27, 2018, Mr. Torres was called into Defendant Mannocchi's office to discuss an incident that occurred with one of the power tools Mr. Torres was using.  Mr. Torres was struggling to learn to use the tool.

122.    Mr. Torres informed Defendant Mannocchi that he had a learning disability and that he needed multiple training sessions on the use of the power tools in order to have a better understanding of how to use the tools.

123.     Despite Mr. Torres' explanation, Defendant Mannocchi submitted an Inmate Counseling Notification, which is a counseling reprimand, reporting the incident with the power tools.

124.    Mr. Torres refused to sign the counseling reprimand because he did not understand it.

125.    On April 6, 2019, Mr. Torres submitted a Request for Reasonable Accommodation asking for individualized training for the Building Maintenance Program so that he could learn to use the power tools correctly.

126.    His request was denied by Defendant Morris on May 1, 2019 and the reason provided was that "it [was] not feasible to provide 1:1 training from the instructor who has to manage the class and assist others." No alternative form of accommodation was offered.

127.    Mr. Torres filed two grievances regarding his difficulties in the Building Maintenance Program bearing the dates of May 22, 2018 and May 23, 2018, respectively.

128.    Because of the grievances, Defendant Mannocchi began drafting a progress report on May 25, 2018, giving Mr. Torres average and lower ratings. For example, Mr. Mannocchi gave Mr. Torres a poor rating in attendance even though Mr. Torres had only missed classes due to a hospitalization.

129.    Mr. Torres' previous progress reports never reflected poor performance. A progress report from March 2017 shows that he was given an "above average" mark in all categories. The rest of the reports range from September 2016 through May 2018 and show positive feedback in the following categories: effort, quality of work, self-control, safety procedures attendance and dependability.

130.    Defendant Mannocchi drafted the negative progress report after he received permission from Defendant Morris to remove Mr. Torres from the class.  He drafted the negative reports to create a record justifying Mr. Torres' removal from the program.

131.    Mr. Torres was ultimately removed from the Building Maintenance Program by Defendants Paton and Morris on June 26, 2018.

132.    Mr. Torres filed a grievance on July 2, 2018 requesting that he be placed back in the Building Maintenance program. DOCCS responded that Mr. Torres was being removed from the program due to "lack of skill."  However, Mr. Torres did not lack skill, he just needed more instruction.

133.    Mr. Torres was two weeks from completing the Building Maintenance Program. He had been in the program already at Green Haven and Coxsackie and when he arrived at Eastern, he made it his goal to complete it and get his certification.

134.    As previously stated, Mr. Torres wants to become a productive member of society upon his release from DOCCS in 2024.  Mr. Torres at least needs this Labor Certificate so that he can sustain himself in the future.

**FIRST CAUSE OF ACTION**
*Violation of the Americans With Disabilities Act Title II*
**(Against Defendants DOCCS, Mannocchi, Paton, Morris and Gibson in their official capacities)**

135.    Mr. Torres suffers from at least two disabilities that negatively impact his ability to write, read, think, calculate, learn and communicate.

136.    Plaintiff has a record of having such disabilities and is regarded as having such disabilities by Defendants.

137.    Defendants Gibson and Morris revoked Mr. Torres' reasonable accommodations by denying him access to the SDU Resource Room computers which have the audio features he needs to read and write unassisted.

138.    Defendants Gibson and Morris revoked Mr. Torres' reasonable accommodations without providing an equally effective alternative accommodation as prescribed by the ADA, its regulations and DOCCS' policies and directives.

139.    Defendants Mannocchi, Morris and Paton failed to reasonably accommodate Mr. Torres so he could finish the Building Maintenance program and earn his vocational certificate.

140.    Defendants' failure to accommodate Mr. Torres excluded him from earning his Building Maintenance certificate.

**SECOND CAUSE OF ACTION**
*Violation of Section 504 of the Rehabilitation Act*
**(Against Defendants DOCCS, Mannocchi, Paton, Morris and Gibson in their official capacities)**

141.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

142.    DOCCS is a state agency which receives federal financial assistance.

143. Mr. Torres suffers from at least two disabilities that negatively impact his ability to write, read, think, calculate, learn and communicate.

144. Plaintiff has a record of having such disabilities and is regarded as having such disabilities by Defendants.

145. Defendants failed to reasonably accommodate Plaintiff's disabilities in violation of 29 U.S.C. 794(a).

146. Defendants' failure to reasonably accommodate Plaintiff's disability exclude him from participating in services, programs and activities and deny him the benefits of such services programs and activities.

147. Defendants Gibson and Morris revoked Mr. Torres' reasonable accommodations by eliminating his access to the SDU Resource Room computers which have the features he needs to read and write.

148. Defendants Gibson and Morris revoked Mr. Torres' reasonable accommodations without providing an equally effective alternative accommodation as prescribed by the ADA, its regulations and DOCCS' policies and directives.

149. Defendants Mannocchi, Morris and Paton failed to reasonably accommodate Mr. Torres so he could finish the Building Maintenance program and earn his vocational certificate.

150. Defendants' failure to accommodate Mr. Torres excluded him from earning his Building Maintenance certificate.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
### *Violation of Rights Secured By The First Amendment*
### (Against Defendants Morris and Gibson in their individual capacities)

151.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

152.     Defendant Morris is the Deputy Superintendent of Programming at Eastern.

153.     Defendant Gibson is in charge of the SDU Resource Room at Eastern and the availability of accommodations therein.

154.     Defendants Morris and Gibson enforce and implement the restrictions of the Computer Use Agreement when and if disabled inmates like Mr. Torres are granted access to the SDU Resource Room.

155.     The Computer Use Agreement prohibiting use of SDU Resource Room equipment for legal work by Mr. Torres denies him necessary accommodations for completing legal work.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### *Violation of Rights Secured By The First Amendment*
### (Against Defendant Morris in her individual capacity)

156.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

157.     Defendant Morris is the Deputy Superintendent of Programming at Eastern. Defendant Morris is or was responsible for policies regarding programming, including the Law Library.  Defendant Morris is or was responsible for the development and/or implementation of the policy restricting legal work on Law Library equipment based on the content of the legal work and its purpose.

24

158.    The denial of the ability to write grievances, internal complaints and non-criminal law related manners on Law Library resources denies Mr. Torres meaningful access to the grievance program and the courts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief and enter judgment in his favor:

A.    Preliminarily and permanently ordering Defendants DOCCS, Morris and Gibson from denying Mr. Torres access to the SDU Resource Room and its computers and to reinstate him in the Building Maintenance Program and allow him to complete it.

B.    Ordering Defendant DOCCS to arrange for a timely psychological examination by a licensed psychologist to assess the current state of Mr. Torres' disabilities and his needed reasonable accommodations.

C.    Ordering Defendant DOCCS to provide Mr. Torres with the reasonable accommodations recommended by the licensed psychologist to provide meaningful access to DOCCS' programs, benefits and services.

D.    Declaring that so long as Plaintiff's learning disability persists, he is entitled to the reasonable accommodations to facilitate his ability to read, write, and understand even when outside of a Basic Education classroom.

E.    Declare that the Computer Use Agreement as enforced against Mr. Torres denies him meaningful access to the inmate grievance program and the courts and violates his rights secured by the First Amendment.

F.      Declare that the Law Library Policy as enforced against Mr. Torres denies him meaningful access to the inmate grievance program and the courts and violates his rights secured by the First Amendment.

G.      Enjoining DOCCS and the named Defendants from enforcing the Computer Use Agreement and Law Library Policy against Mr. Torres.

H.      Awarding compensatory damages to Plaintiff.

I.      Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and 42 U.S.C. § 1988; and

J.      Ordering such other and further relief as the Court may deem just and proper.

Dated: Far Hills, New Jersey
      March 17, 2020

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: _/s/ *AJ Agnew*
Amy Jane Agnew, Esq.
*Counsel for Plaintiff*
Bar No. 700639
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com